My name is Jacob Weisselman. Initially, I seek to clarify or highlight just a few issues. Thereafter, I will take, should the Court have any questions. Your Honor, at page 7, footnote 1 of the Government's brief, the Government urges the Court to disregard the District Court's findings of fact that Mr. Struckman immediately told the officers that he lived at the residence at which he was arrested. The second paragraph of the Court's decision on the motion to suppress evidence states, When first observed, Struckman did not have a backpack. When Struckman saw police officers, he stopped and informed them that he lived at the residence. He dropped his jacket, at which point Officer Mudrick pointed a gun at Struckman. The Government disagrees, apparently, with the District Court's finding of fact and says at footnote 1, there's a clear discrepancy between the Court's findings, fact-finding, on the question of when the officers first informed – forgive me – when Mr. Struckman first informed the officers that he lived at the residence. Mr. Weissman, I know you suggested that we not interrupt you until you've made your corrections. That's your question. That's my problem, and that's why I don't want you to go in that direction. Let's assume all of that is true. Yes, sir. The police had been called. They had been told that an intruder, somebody was about to do it. And did the way in which Mr. Struckman gained egress into that – I mean, entered that property suggest to the police officer who knew the way he entered, this is the person who lives at this residence? It could, Your Honor. It certainly warranted intrusion. Most people climb the fence to get into their homes. My children do, Your Honor. I'm suggesting what a reasonable police officer would assume based on the information that he'd received. And I think if you want to get to the heart of what at least a third of the Court's concerned about, you're going to talk about that. It isn't what the facts were. It's what a reasonable officer would have understood at the time based on what he knew and what he saw. Isn't that the question we have to answer? Yes, sir. And we have to decide, I guess, if we want to decide as you want us to, that the police were unreasonable. Correct. Because he said to them when he first climbed, and let's assume he said it the minute he saw them, I live at this residence. Don't we have to do that? Isn't that the narrow question that we have to decide? It is. All right. Now, tell us why we ought to decide it as you think we should. The fact pattern that presented these officers is no different than if I were to go to a neighbor's house having permission to take the car and open the car door and went inside. A neighbor seeing me go into that car might say, somebody's taking that car. I alluded to my children. Children, anyone climbing over a fence, gives a ground for inquiry. The problem here is that the officers exceeded what was reasonable in their response. What should have occurred, Your Honor, is for the officers to have said, yo, young man, and he'd say, I live here, and then say, what's your name? And they could have checked it out as they testified in the various hearings on their behalf. So I'm not saying they didn't have a reason to respond to the scene and to make a reasonable inquiry, even if it was in his backyard. I would not say that they couldn't stand on a periphery and say, sir, do you belong here? But when he says, I do belong here, and they must take that exculpatory evidence into consideration. Go back to what you said before, to the question of when he said whatever he said. Is there, in fact, any evidence that he did say it immediately? Your Honor, I would turn the Court's attention. I think there's a reasonable basis for the Court to have concluded that, and that ultimately, I think, is discrimination. That's what I'm asking you. I thought all the evidence actually was that he didn't say it until he was handcuffed. Officer Mudrick indicated at excerpt of the record 266 that he didn't recall if it was prior to being cuffed or after he was cuffed that Mr. Struckman said he lived there. He did say he told me three or four times. Now, what I suggest the Court relied on is that 262 of the record, this is during the ER 262, this is during the testimony on the motion to suppress evidence. Officer Mudrick says, I drew my gun on him as soon as I saw him. At 263, line 23, I believe, Officer Mudrick says, he told me that he lived at the residence just after I told him to get on his knees and he complied. The Court will recall the testimony was that the officer appeared over the fence, having stood on a box or a chair, saw Mr. Struckman coming around the side of the house without any weapons, any burglars' tools, and immediately pointed a gun at him and told him to get on his knees. So at 262 and 263, by Officer Mudrick's testimony that he told him to get on his knees and he told me that he lived at the residence just after I told him to get on his knees and he complied, ER 263, I suggest there's a reasonable basis in the testimony, in the record, for the Court to have concluded that the officers were told prior to breaking into the yard that Mr. Struckman lived there. And the Court's finding is not clearly erroneous. Okay. Let me ask you a question about the backpack. When he said, it was not mine, and perhaps he added it was my sister's, how does he have standing to contest the search of the backpack? It's his home. He has a clear and reasonable expectation of privacy on the premises and he's within his curtilage. And I don't know of support saying that you can abandon property that's on your home or a home to which you intend to return. You haven't abandoned the home. You have the right to challenge the search. But he said it's not mine. It could very well. Assuming he simply said it's not mine, it's not clear and unequivocal that he was abandoning it. Your Honor, there is, if I may, cited within, forgive me, cited within our brief are the cases indicating that simply indicating that it's not yours or that standing alone is not sufficient indicia of clear intent to abandon. Saying it's not his doesn't mean that he doesn't know whose it is, that it's not legitimately on the premises. The question was, is there a gun in the backpack? And he said, I don't know. It's not mine. He did not say, I don't know anything about the backpack. But on top of that, I think the question is, can you abandon something on your own property? Did the officers, whether it was his or not, have the right to enter the property to conduct the search? So he certainly has standing to conduct the search. And then we, forgive me, he has standing to challenge the search. And then the issue becomes, is abandonment, if it can be done on your own property, even an issue here. The officers did not have the right to be on the property. The issue of whether or not he abandoned or simply said it was his sister's then becomes immaterial. I would point out to the Court, well, there has been an issue made of whether or not he says, ever said it was his sister's, without elaborating that point. What difference would that make? Well, I think, again, Your Honor, it goes back to the point we just said. Abandonment must be clear and unequivocal, an intent basically not to have anything to do with it. And if he says it's not mine, it's his sister's, it is consistent with several of the cases. U.S. v. Reeves, Eastern District of Washington, which I believe is cited in our brief, where an individual, same exact fact pattern, the individual says it is not something to the extent of it is not my briefcase. But he didn't abandon it. He said it was my cousin's. Here, he says it's my sister's. I'd cite the Court to ER 207 and, again, ER 210, the radio runs, and both of them, Your Honor, contain the name of the sister, Rhonda Kent. If the police officers, as the government would suggest, were not told by the defendant that it was his sister's bags, why would they be running a radio run and checking the name of Rhonda Kent? That alone is evidence that, in fact, he did say it was his sister's. And, again, that undermines an assertion that it was a clear and unequivocal intent to abandon the property. Kagan. You don't argue in your briefs, although it's an interesting argument, that you don't argue in your briefs that because it was his property, it doesn't matter whether he said it was his or not. Is that – is there any case law to support that? It sounds logical, but it's not in your briefs. It's not. I just looked, so I'm just asking you, is there anything else? Yes. Well, the Kovacs – I believe it's a Kovacs case, U.S. v. Kovacs, 795-1509 at the Ninth Circuit, the person has standing to challenge because of a reasonable expectation of privacy in the place searched. And that is – it is not cited in the brief, in fact, by my oversight, I imagine, because I've always operated on the assumption that someone has a standing to challenge a search of their own premises. Your Honor, we have pointed out that there is standing, there is not clear evidence of abandonment, and by way of clarification that I don't think there is clear error in the Court's record, we don't believe the exigent circumstances exist. I won't elaborate. They're carried out. Well, with regard to exigent circumstances, assuming whether or not he said or without regard to when he said that it was his house, they certainly weren't required to believe that at that moment. So wasn't there at least probable cause of a criminal trespass in progress? When they first approached, I think there was reasonable basis to believe – to investigate a criminal trespass. They looked over the fence, and Officer Wilson – and the entire testimony of Officer Wilson in this regard is verbatim in my brief – he says that the man did not have any tools on him, that the man didn't exhibit anything. He stopped immediately. But it would still be a criminal trespass. I mean, I think the probable cause of burglary is weak, but the probable cause of criminal trespass probably isn't. What I wanted to ask you was, wouldn't that be sufficient exigent circumstances in the sense – just a minute. I'm sorry. Take your head yet. That it was a crime in progress. And what are police supposed to do at that point? Just walk away? No. I think they could ask whether – what was he doing there? Do you belong here, young man? Okay. And suppose they still had – what I really want to get at is if they still had probable cause to think there was a criminal trespass in progress, do they need any more exigent circumstances than that? I believe they do.  They can get a warrant. And one of the requirements is they can't reasonably get a warrant. Well, he, of course – if they think it's a criminal trespass, they think he's not on his property. So do they need anything more than that? If they did not believe he was on his property, if he did not respond in some manner that made them think that perhaps he was legitimately there, then I think there would be – And then there was actually exigency issues. All the pieces collapse into each other. Because if they had probable cause to believe what they thought they believed, then there's no exigency question. But if they had probable cause to believe what they thought they believed, then there  But if they had probable cause to believe what they thought they believed, that's what I'm trying to clarify. If they, in fact, thought that there was a crime in progress, reasonably believe there was a crime in progress. Even if it was on private property. If it's on somebody else's property, they should go in and safeguard it. They should what? I'm sorry? They should go in and safeguard or stop the situation. But our argument, of course, there's all sorts of circumstances. I understand. So there's no – all I'm trying to clarify is there really isn't a separate exigency issue here. They're both the same question. I believe they are. Okay. Thank you. May it please the Court, good morning. Tom Edmonds for the United States. Members of the Court, you have touched upon, I think, the primary issue before us this morning, and that is the question of reasonableness, the touchstone of any Fourth Amendment question. And in the circumstances that confronted the Portland police officers who responded to this 911 call of a neighbor, they were responding to what Officer Mudrick testified to, and I believe he was reasonable in his conclusion, that he was responding to a burglary in progress. Well, there's really no evidence of that. Even the call didn't say – first she said, I think there was a burglary. But then she went on to say, well, I guess so, because the guy just went over the fence. But she didn't see anything actually indicating he was trying to get into the house, and that isn't what the radio call said. So they knew this guy was on somebody else's property, but they didn't know that he was trying to break into a house. Well, they didn't know, Your Honor, but the probable conclusion was that someone jumping over a fence at 11.45 in the morning, who's unknown to the neighbor, she knows that her neighbors are not home, that they're at work. She doesn't recognize this man, and that's what prompts her to call 911. What difference does it make? I mean, I have trouble with that, but there was at least probable cause, if he did live there, of a criminal trespass. So what difference does it make? Well, I think it matters in terms of how the officers responded to this. But I think defense counsel has conceded that they would have had probable cause for a criminal trespass. No, he hasn't. He's conceded that they maybe had reasonable suspicion of a criminal trespass and should have asked a question before they arrested the guy. Well, Your Honor, my position is that when they responded, as Officer Mudrick testified, he was responding to what he believed was a burglary in progress. When they arrived there, this situation escalates rather than de-escalates. If you'll recall, the facts of the fence are that it surrounds the backyard, that it's slatted, that it can't be seen through at every occasion, and that Officer Mudrick actually has to get up on some sort of platform, he said a chair or a table that was there, to be able to see into the backyard. And when they see the defendant, he's come around the corner of the house. He has a shocked look on his face in seeing a uniformed officer, which is not necessarily a suspicious factor in and of itself. But what does he do? He sheds his coat on a December day here in Portland. That's a very unusual fact, one which Officer Mudrick concludes means to him that the defendant's either going to run or fight. A reasonable conclusion. He believes this man is at a minimum a trespasser and potentially a burglar. The officers don't know if there's another accomplice involved who may be in the  What about this question of when he said that it was his house? Well, I want to respond to that, because the record's very clear, and I think the most poignant point in the record about this, and I've cited to all the occasions in the record where this issue was dealt with, but Officer Mudrick was cross-examined at the motion to suppress hearing, and he immediately told you, I live here. Is that correct? Defense counsel asked him. He said no. It wasn't until after I had climbed over the fence that he started actually cussing at us and making those statements. It couldn't be any clearer in the record about when the statement was made about whether he lived there or not. But still before he handcuffed him and Well, he says that he wasn't sure whether it was before or after handcuffing, but it was at the time of handcuffing. And this situation, Your Honor, has escalated. And rather than de-escalate It hasn't escalated much. I mean, I don't know what to make out of this dropping of the jacket. It's a relatively neutral fact. You may want to clarify something for me at least. Yes, Your Honor. Can I have a question? What are we reviewing? Are we reviewing what the facts are or what was what appeared to a reasonable police officer under the circumstances? And I gather, at least, and I'm speaking only for a third of the Court, that what we are reviewing is what was reasonable to a reasonable police officer under all the circumstances. That's absolutely correct. Now, that's not the test, tell me. No, that is the test. In fact, the courts have said that the subjective view of the officer is irrelevant and that it is to be viewed, the totality of the circumstances to be viewed at the time that the entry is made. And the time that the entry is made is when Officer Mudder is responding to this dispatch and he's faced with a defendant who's come around the house who sheds his coat. And we know that the defendant was high on methamphetamine from facts that are in the record of this case. And the conclusions of the officer are that once he's over the fence and he's taking control of the defendant, that the defendant starts acting in broad mood swings between violent behavior in terms of trying to pull away from the officer, screaming, and then being calm and polite. And the officer's conclusion at that point is to take control of the situation, which he does. Well, I have a question, then, about the backpack. Yes, Your Honor. This is unlike the Nordling case where the pack was in a place open to the public. No public were around. After they patted him down, found that they had he had no gun, how was there an objectively reasonable need to protect the public? Well, Your Honor, there was a pistol magazine in the pocket of the defendant. And the pistol magazine clearly announces that this individual may be possessing a firearm in some way. But he couldn't be possessing it very much at that point because he was handcuffed from 20 feet away. Well, Your Honor, they still are in a situation, and the reasonableness test here has to apply, where they believe that there may be a burglary in progress. And there may be other people who are involved in that burglary. There's a pistol magazine in his pocket, which strongly suggests the way the holster in the Quarles case suggested that the individual was armed at some time, even though he doesn't have the weapon on his person. Did the district court ever decide that, or did he just decide there was no standing? No, the district court on the abandonment question, Your Honor. As to the backpack? The district court clearly decided factually, and that's the review here, is for a clear error standard, not that he abandoned. Right. So he didn't decide that it would have been reasonable, the Fourth Amendment question of whether if he didn't abandon it, there would have been a basis for searching it at that point rather than getting a warrant. No, there was no discussion of that. The decision on the seizure of the firearm was made clearly and only on the abandonment theory that was advanced. Okay. Well, what about this question of whether if it was his house and it was his house, it doesn't matter whether it's his or not? I don't believe that there's any law that suggests that you can't abandon property on private property or that would be different. Well, it makes sense. I read this. Grist read the thing. Did he say it's his house, or did he say he lives there? He said he lived there, Your Honor. I thought he did. He said he lived there. And my position to the Court is that the officers acted entirely reasonably in making the inquiry about his saying he lived there at the time that they did. This episode from start to finish, from the time that he's coming around the corner of the house to the time that they seized the firearm, is clearly less than about two minutes in the record of this case. Even the defendant would agree with that in his testimony at the trial two years later, that this happened very, very quickly. He's in custody. They've found the magazine. They find the gun in the backpack, which has been abandoned. And then when he's taken over the patrol car, they run his name. They do determine that he lives there, but they also determine that he's a felon, that he's been convicted of burglary, and that he's under supervision. And at that point, the arrest becomes for felon in possession of a firearm. I want to answer two other issues that I think have been raised here. First of all, the quarrels issue really has two parts to it. One, whether the statement could be used at trial. And it's clearly harmless error because it was purely an exculpatory statement, which in the face of all the inculpatory evidence at the trial, was harmless beyond a reasonable doubt. The second issue that defense counsel raised was whether or not that statement could be used to address the abandonment question. And that statement clearly can be used to address the abandonment question. Number one, it was voluntarily made. The defendant wanted to disassociate himself with that particular backpack. He repeated that disassociation disclaimer. He was asked a question. Pardon me? He was asked a question. He was asked a question. But the statement that he made was voluntary. He wanted to disclaim ownership. He disclaimed ownership again at the station house after Miranda had been advised. He disclaimed ownership at the trial two years later. He wanted to make that statement. I don't know of any rule that says that if you ask somebody a question in violation of Miranda, the fact that they answer it in a way that's favorable to themselves makes it voluntary. I'm not saying it wasn't a violation of Miranda, but I don't think the fact that he, in answer to a question, answered it in a way that was favorable to him makes it voluntary. He was asked where's the gun. Presumably, if he hadn't been asked where's the gun, he would have said nothing. Well, I think the question here, Your Honor, is whether he wanted to make the statement that he made, whether he wanted to say what he said. Well, he didn't want to say anything, but he was asked. He wasn't forced to incriminate himself. This isn't a self-incrimination question or answer. It's not incriminatory. Unless it turned out, of course, it was, because he was a felon. Well, Your Honor, the position of the government is that that statement can be used both at trial but also to address the abandonment question. And I believe under the Patain decision in the Supreme Court, the simple allegation here has been made that it was an unadvised statement, and unadvised statements can be used to seize physical evidence, and that decision is a clear precedent that would apply in this situation. So I don't think that position merits any further attention. The Quarles decision, in terms of the statement that was obtained here, I believe supports the whole Fourth Amendment calculation that the Court has to make in that there was public safety risk to what was going on in that backyard that warranted the officer, in the very quick way that he did, assessing the situation, finding the magazine, realizing that there was an unaccounted-for firearm, and asking the simple question. It certainly corroborates the reasonableness of the reaction that these officers, particularly Officer Mudrick, responded with. The final issue, the sentencing issue, I simply would suggest supports another issue in this case with some nexus. I don't think there's any real dispute here that the Mayer decision says that those burglary convictions count as predicate felonies under the Armed Criminal Act. And why? Because this Court and other courts have found that that type of burglary is categorically a violent felony. And here we have a situation involving burglary at the very heart of what was going on in terms of the officer's response. And I suggest that the argument in your case better if you stayed off the burglary and just stuck to criminal trespass. Thank you. Thank you, Your Honor. Your Honor, the focus here on the point of seizure is when the gun was drawn. I'm sorry, I'm not hearing you. The focus for the seizure is when the gun was drawn, not later on when he acted as if he were under meth or any of those other points. The point of seizure when he felt he could not reasonably leave the scene is when the gun was pointed at him. I would point out ER 275 where Officer Mudrick says the mood swings occurred after he was cuffed. So that's immaterial. I would also point out, Your Honor, that the fact that he said, even if there were at the time that the gun were pointed, when he said, it's my residence, that dissipates and that must be taken into consideration. Finally, the officers cannot use as an excuse for wrongfully entering this premises or seizing this defendant exigent circumstances which they themselves create. And I believe cited in the brief is the Calhoun case, Ninth Circuit. They escalated the situation by pointing a gun at this individual. Mr. Struckman did nothing. You cannot ask anything more of an individual when he's confronted by police officers than to stop dead in his tracks and stand there. And that's what he did in this case, Your Honor. The only thing that prevents this case from having been before the Court as a 1983 action for violation of Fourth Amendment and Fifth Amendment is the fact that, unfortunately, the guns were found. But that, to a degree, is immaterial. The focus here is long before the gun was found. Thank you, Your Honor. Well, thank you very much. The case of United States v. Struckman is submitted. I didn't say it, but the first case on the calendar, United States v. Kavio Nieves, is submitted on the briefs. And we will go to Stillwater v. Astrew.
judges: Farris, Nelson D. W., Berzon